A11A1328. ALEMAN et al. v. SUGARLOAF DIALYSIS, LLC et al.
(719 SE2d 551)

ADAMS, Judge.

Marcos Aleman, individually and as administrator of the estate of Josefa Aleman, appeals entry of summary judgment on claims arising out of the death of his wife of 15 years. Josefa had diabetes, and while undergoing dialysis she became unresponsive. Despite attempts to resuscitate her, she never regained consciousness; she died about three weeks later. In this action, Aleman claims the defendant medical providers were negligent in how they reacted when Josefa initially became unresponsive, including that they failed to provide proper cardiopulmonary resuscitation (CPR) and failed to use an automated external defibrillator (AED). He also asserts negligent hiring, training, supervision, and retention. The trial court found Aleman had failed to raise an issue of material fact regarding causation.

The record shows that on December 26, 2006, Josefa began dialysis at Sugarloaf Dialysis, LLC at 10:37 a.m. At 10:48, Michelle Mouang, the patient care technician, noticed Josefa's blood pressure was low. She administered saline, but Josefa passed out possibly as early as 10:50. Mouang summoned nurse Oluwole "Wally" Adepitan. He arrived "within thirty seconds" and asked her to get an oxygen tank, which took "less than a minute." They connected the oxygen and tilted Josefa's dialysis chair so that her feet were above her head. Adepitan administered more saline and called the attending doctor. At some point Josefa became unresponsive, and, according to Mouang, Adepitan began CPR, although she was not sure at what time or whether he started after the 911 call. She testified, "after we called 911, the CPR started, and then I went to see another patient." Before she moved to the other patient, Mouang saw Adepitan begin CPR; she recalled that Josefa was still in her chair. Josefa was disconnected from the dialysis machine at some point. According to emergency medical service (EMS) records, the 911 call was received at 10:53 a.m. But the nursing record states, among other things, "Paramedics arrived and started CPR; I was told to detach ED."

EMS technicians arrived at 10:59, got to Josefa at 11:00, and saw that CPR was already being performed with a bag valve mask. The

lead EMS responder thought that Josefa was on the floor beside the chair when they arrived, but he could not be sure. EMS records state that when they arrived, Josefa's heart was in a state of "pulseless electrical activity," meaning a monitor will show some electrical activity in the heart, but there is no actual beating. In this state, an AED will not deliver a shock. Among other things, EMS administered drugs to restart the heart and took Josefa to a hospital emergency room. She was diagnosed with anoxic encephalopathy, or brain damage caused by lack of oxygen. She never regained consciousness, and she died on January 16, 2007.

Plaintiff's expert Dr. Victor Chou testified that based on his review of Josefa's medical records from Sugarloaf Dialysis, the staff at Sugarloaf Dialysis had failed to timely or properly perform CPR or to use an AED, and that such a failure violates the standard of care. He opined "that if [Josefa] had been given immediate CPR, as well as timely use of an AED, significant neurological damage could have been avoided." Nevertheless, Chou admitted that the literature concludes CPR is only effective between five and thirty percent of the time, and, relying on that fact, he could not say one way or the other whether immediate, correct CPR would have led to a different outcome or whether restarting her heart within thirty seconds of cardiac arrest would have resulted in her condition being any different. The trial court held that the plaintiff had failed to raise an issue of fact concerning whether Josefa's injuries were caused by the alleged failure to timely administer CPR and/or to use an AED.

On appeal, Aleman contends that the trial court erred by concluding there was no material issue of fact regarding causation. Aleman relies on Dr. Chou's testimony that based on a reasonable degree of medical certainty, (1) "chances of suffering anoxic brain injury after cardiac arrest are dramatically increased if CPR is not performed immediately and if an AED is not used within five minutes of cardiac arrest"; (2) that immediate CPR and use of an AED creates a "high likelihood" that the risk of brain injury to Aleman would have been "significantly reduced"; (3) that CPR was not timely performed on Aleman; (4) that performing CPR in the dialysis chair falls below the standard of care; (5) that an AED was not used in a timely manner; (6) that an AED should have been attached regardless of Josefa's condition, because in addition to defibrillating, it functions to inform those attending of the patient's heart rhythm; and (7) that the success rate of AED use is more than 50 percent.

The defendants agree with the trial court that there was no issue of fact raised regarding causation, and they argue another point raised below — that there is no evidence that they violated the standard of care.

1. In his depositions, Chou testified that all health care providers trained in basic life support, regardless of the setting, are subject to the same standard of care regarding use of CPR and an AED. He testified that once a patient exhibits symptoms of cardiac arrest, such as a finding of no pulse, CPR should be begun immediately and an AED should be connected within the first few minutes. The AED should be connected even though it will not provide a shock under certain circumstances, because the AED interprets the patient's heart rhythm and will deliver a shock if appropriate, and it will instruct on whether to continue CPR. He testified that CPR in a soft dialysis chair in a seated position also falls below the standard of care.

Although Mouang testified that Adepitan started CPR and the EMS record states that CPR was being performed when EMS arrived, the dialysis record prepared by Adepitan states, "Paramedics arrived and started CPR; I was told to detach ED." We do not have an affidavit or a deposition from Adepitan. The quoted sentence could be construed to mean that CPR was first begun when EMS arrived. Conflicts in the evidence are to be resolved by the jury. *Montgomery v. Barrow*, 286 Ga. 896, 898 (1) (692 SE2d 351) (2010) ("it is precisely because there are bits of evidence in the record which create genuine issues of material fact that summary judgment is not appropriate in this case.").

Also, Mouang testified that when CPR was begun, Josefa was in a soft, reclining dialysis chair. Construed in favor of Aleman, it could be that CPR was improperly performed in this manner from the time of the 911 call to the time that EMS arrived, which was approximately seven or eight minutes. Thus, there is an issue of fact regarding whether CPR was correctly performed, and given the amount of elapsed time and the fact that Josefa had no pulse when EMS arrived, a jury could find that this fell below the standard of care. Mouang also testified that the dialysis center had an AED available for use that day, but she did not know whether Adepitan had used it on Josefa. And no one explained what Adepitan meant when he said "detach ED" in his report. Thus, there is an issue of fact as to whether the defendants failed to use an AED.

In short, with regard to both CPR and use of an AED, there is some evidence that the defendants violated the standard of care as provided by Dr. Chou.

2. In response to a motion for summary judgment in a medical malpractice case, the plaintiff must be able to show an issue of fact regarding causation:

> It is clear that a plaintiff cannot recover for medical malpractice, even where there is evidence of negligence,

unless the plaintiff establishes by a preponderance of the evidence that the negligence "either proximately caused or contributed to cause plaintiff (harm)."

*Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003); OCGA § 9-11-56. To do so, the plaintiff must present expert medical testimony establishing causation to a reasonable medical probability or reasonable medical certainty:

> In order for the plaintiff to show that the defendant's alleged negligence was the proximate cause of the plaintiff's injury, the plaintiff must present expert medical testimony. An expert's opinion on the issue of whether the defendant's alleged negligence caused the plaintiff's injury cannot be based on speculation or possibility. It must be based on reasonable medical probability or reasonable medical certainty.

Id. at 503-504.

Here, Chou gave conflicting testimony regarding causation. On the one hand, he testified that proper CPR and AED use would have reduced the risk of brain injury significantly:

> [B]ased on my experience as a medical doctor, based on my training and practice and based on the review of the medical literature, I believe that there was a high likelihood that if these processes [CPR and use of an AED] had been performed in accordance with the appropriate basic life support guidelines, the risk of anoxic brain injury would have been significantly reduced.

He testified that his opinion was based on a reasonable degree of medical certainty. He reiterated that within a reasonable degree of medical certainty, "if she had been given immediate CPR, as well as timely use of an AED, significant neurological injury could have been avoided." In addition, he testified that with regard to AED use, results are improved in correlation with how quickly the AED is used. And use of an AED within the first few minutes of symptoms of cardiac arrest improves chances of successfully restoring a person's heart to its regular rhythm to over 50 percent.

On the other hand, Chou testified that, given that medical literature states that CPR has only a five to thirty percent chance of success, he could not say one way or the other whether timely CPR would have changed the outcome for Josefa. He also could not state to a reasonable degree of medical certainty that, had Josefa's heart

been restarted within 30 seconds, the result of her cardiac arrest would have been any different.

The Supreme Court long ago affirmed that the "self-contradictory testimony rule" is not applicable to an expert witness and that the jury must resolve such issues:

> Because a party to litigation is without power to prevent his or her witnesses from contradicting themselves when testifying, the party should not be held responsible under *Prophecy* when such contradictions inevitably arise in the testimony of expert witnesses. Furthermore, simply because an expert witness's testimony is contradicted is no cause for disregarding it under the *Prophecy* rule — the fact that an expert witness's testimony is contradictory has never rendered that testimony inadmissible. To the contrary, such contradictions go solely to the expert's credibility, and are to be assessed by the jury when weighing the expert's testimony.

*Thompson v. Ezor*, 272 Ga. 849, 853 (536 SE2d 749) (2000). The facts of *Ezor* are analogous. As summarized by the Supreme Court:

> During discovery, Hayes [the expert witness] gave deposition testimony in which he stated that rather than being negligent, Thompson's conduct was against "conventional wisdom" and "the party line." Hayes also conceded that Thompson's practices may actually have been "way ahead" of the ophthalmology profession, and Hayes admitted he was "not sure" Ezor was harmed by the second of the multiple vision correction operations that Thompson performed on her eyes.
>
> Thompson then moved for summary judgment. Ezor responded by filing a second affidavit from Hayes, in which Hayes contradicted his deposition testimony by stating that Thompson had violated the standard of care by not waiting three months before performing the second surgery on Ezor's eyes, and that Ezor had suffered permanent injury as a result.

Id. at 850. Despite the significant conflict in the expert's testimony regarding the breach of care and causation, summary judgment was not proper in that case. See also *Naik v. Booker*, 303 Ga. App. 282 (692 SE2d 855) (2010) (jury must resolve conflict between expert's deposition testimony regarding causation and affidavit on same topic).

Because Dr. Chou's testimony combined with the other evidence described above raises an issue of fact regarding Aleman's malpractice claim against the defendants, we reverse the decision of the lower court granting the defendants' motion for summary judgment.

*Judgment reversed. Barnes, P. J., and Blackwell, J., concur.*

DECIDED NOVEMBER 16, 2011.

*Jimmy Hwang*, for appellants.
*Hall, Booth, Smith & Slover, Richard N. Sheinis*, for appellees.